**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 21-cv-12030-DJC** |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,** | ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

**MEMORANDUM AND ORDER**

CASPER, J.                                                                                             **July 21, 2023**

I.      **Introduction**

        Plaintiff Harvard Immigration and Refugee Clinical Program ("HIRCP") has filed this lawsuit against the United States Department of Homeland Security ("DHS") and United States Immigration and Customs Enforcement ("ICE") (collectively, the "Agencies") alleging violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, in connection with its requests for records concerning ICE's use of solitary confinement in immigration detention centers. D. 1. HIRCP claims that the Agencies failed to conduct adequate searches in response to its FOIA requests and improperly redacted or withheld responsive documents. Id. Both the Agencies, D. 48, and HIRCP, D. 59, now move for summary judgment. For the reasons stated below, the Court ALLOWS in part and DENIES in part each of the motions and directs the parties to take the actions as directed in this Order.

1

## II.      Standard of Review

"FOIA cases are typically decided on motions for summary judgment." Am. C.L. Union of Mass., Inc. v. U.S. Immigr. & Customs Enf't, 448 F. Supp. 3d 27, 35 (D. Mass. 2020) (citation and internal quotation marks omitted). Summary judgment is warranted for a defendant in a FOIA case "when the agency proves that it has fully discharged its obligations under the FOIA after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Crooker v. Tax Div. of U.S. Dep't of Just., No. 94-30129 MAP, 1995 WL 783236, at *7 (D. Mass. Nov. 17, 1995) (citation and internal quotation marks omitted). An agency discharges its burden when it "prove[s] that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the [FOIA's] inspection requirements." Gillin v. IRS, 980 F.2d 819, 821 (1st Cir. 1992) (alterations in original) (citation and internal quotation marks omitted). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately [has] the onus of proving that the [documents] are exempt from disclosure,' while the 'burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" Leopold v. Dep't of Just., 301 F. Supp. 3d 13, 21 (D.D.C. 2018) (alterations in original) (quoting Pub. Citizen Health Res. Grp. v. FDA, 185 F.3d 898, 904 (D.C. Cir. 1999)).

## III.     Factual Background

Unless otherwise noted, the following facts are undisputed. These facts are primarily drawn from the Agencies' statement of undisputed material facts, D. 50, HIRCP's response to same, D. 58, HIRCP's statement of undisputed material facts, D. 62, the Agencies' response to same, D. 64, and supporting documentation.

On September 4, 2013, ICE published a directive ("the ICE directive") that specified "ICE staff responsibilities for placement, review, and notification about segregation of all detainees, including detainees with special vulnerabilities."  D. 62 ¶ 2; D. 64 ¶ 2.  According to the ICE directive, "[p]lacement of detainees in segregated housing . . . should occur only when necessary and in compliance with applicable detention standards" and placement in segregated housing "due to a special vulnerability should be used only as a last resort and when no other viable housing options exist."  D. 61-1 at 2; D. 62 ¶ 3; D. 64 ¶ 3.  On September 29, 2017, the DHS Office of Inspector General ("OIG") released a report ("the OIG Report") that "sought to determine whether, for detainees with mental health conditions:  (1) facility personnel follow ICE guidance for documenting segregation decisions; (2) facilities report segregation data accurately and promptly; and (3) ICE field offices follow procedures for reviewing segregation."  D. 61-2 at 4; D. 62 ¶¶ 5–6; D. 64 ¶¶ 5–6.  OIG selected seven facilities "to visit and review judgmental samples of instances in which detainees with mental health conditions were held in segregation and to assess the confinement conditions."  D. 62 ¶ 8; D. 64 ¶ 8; D. 61-2 at 18.  The OIG Report found that the ICE field offices reviewed "did not record and promptly report all instances of segregation to ICE headquarters, nor did their system properly reflect all required reviews of ongoing segregation cases per ICE guidance."  D. 61-2 at 4; D. 62 ¶ 9; D. 64 ¶ 9.  There are three FOIA requests that remain at issue between the parties and the Court now turns to each of them.

A.    **The OIG and CRCL FOIA Request**

On November 21, 2017, HIRCP submitted a FOIA request to ICE seeking records relating to the 2017 OIG Report, and complaints filed against ICE with DHS's Office for Civil Rights and Civil Liberties ("CRCL") ("the OIG and CRCL FOIA Request").  D. 62 ¶ 10; D. 64 ¶

10; see D. 1-3.  Part A of the OIG and CRCL FOIA Request sought "the disclosure of records submitted by ICE to the OIG between July 2016 and January 2017 pertaining to detainees with mental health disabilities placed in segregated housing."  D. 1-3 at 4; D. 62 ¶ 11; D. 64 ¶ 11. "Part B of the OIG and CRCL FOIA Request sought the disclosure of records submitted by ICE to CRCL in response to complaints received by CRCL relating to the segregation of detainees; records within ICE's possession related to the outcomes of CRCL's investigation into the 'Primary Allegations' of the complaints against ICE; Records submitted by ICE to CRCL in response to the 'Primary Allegations'; and records within ICE's possession related to the outcomes of CRCL's investigation into the 'Primary Allegations.'"  D. 62 ¶ 12; D. 64 ¶ 12; see D. 1-3 at 6.

       *1.*     *The OIG Portion*

On February 21, 2018, ICE referred the OIG and CRCL FOIA Request to OIG for processing.  D. 50 ¶ 7; D. 58 ¶ 7; see D. 1-3 at 14, 27.  On December 10, 2018, OIG responded to HIRCP regarding this request, releasing one page in full and twenty-nine pages in part and withholding three pages in full, citing Exemptions 5, 6 and 7(C).  D. 50 ¶ 8; D. 58 ¶ 8; see D. 1-3 at 27–28.  OIG also referred 221 pages to ICE for processing.  Id.  By the time that HIRCP filed the complaint here on December 13, 2021, D. 1, "ICE had not yet finished processing the 221 pages that OIG had referred to ICE."  D. 50 ¶ 13; D. 58 ¶ 13; see D. 49-17 ¶ 12.  HIRCP also alleged that OIG did not provide it "with the necessary explanations for its withholdings."  D. 1 ¶¶ 40, 105–116; D. 50 ¶ 10; D. 58 ¶ 10.  Accordingly, at the commencement of this litigation, HIRCP sought relief "ordering DHS OIG to release any improperly withheld nonexempt information in the responsive records to the OIG Request," D. 1 ¶ 119; D. 50 ¶ 10; D. 58 ¶ 10,

and "ordering ICE to process the 221 pages responsive to the OIG Request." D. 1 ¶ 118; D. 50 ¶ 13; D. 58 ¶ 13.

"During this litigation, OIG re-processed the 32 pages that it had previously withheld in full or in part. Specifically, OIG referred the 3 pages that it had withheld in full to ICE for processing." D. 50 ¶ 11; D. 58 ¶ 11; see D. 49-2 at 2. "OIG also removed certain redactions from the 29 pages that it had withheld in part, and re-produced these 29 pages to [HIRCP] on March 30, 2022." D. 50 ¶ 11; D. 58 ¶ 11; see D. 49-3 at 2. "On May 18, 2022, in an attempt to narrow the issues in this litigation, OIG provided [HIRCP] with an informal Vaughn index explaining the basis for its redactions to the 29 pages that it had withheld in part." D. 50 ¶ 12; D. 58 ¶ 12; see D. 31 at 2. On July 6, 2022, ICE responded to HIRCP regarding the 221 pages that OIG had referred to ICE. D. 50 ¶ 14; D. 58 ¶ 14; see D. 49-6 at 2. ICE released 156 pages in full and 56 pages in part, citing certain exemptions. Id. HIRCP still challenges the adequacy of this search. D. 60 at 10.

### 2.    The CRCL Portion

ICE determined that it was the appropriate office to respond to the CRCL portion of the OIG and CRCL FOIA request and tasked Enforcement and Removal Operations ("ERO") and the Office of Professional Responsibility ("OPR") with conducting searches for responsive records. D. 50 ¶¶ 16–17; D. 58 ¶¶ 16–17; see D. 49-17 ¶¶ 9, 30. On December 21, 2018, HIRCP submitted an administrative appeal with ICE regarding this request. D. 50 ¶ 18; D. 58 ¶ 18; see D. 49-17 ¶ 13. On July 8, 2019, ICE issued a response, but HIRCP did not receive it due to an "email error" prior to the filing of the complaint. D. 50 ¶ 20; D. 58 ¶ 20; D. 49-17 ¶ 15; see D. 49-1. Accordingly, at the commencement of this litigation, HIRCP sought an order requiring ICE to respond to the CRCL Request. D. 1 ¶ 118; D. 50 ¶ 20; D. 58 ¶ 20.

On April 1, 2022, ICE re-issued its response to HIRCP regarding the CRCL request.  D.
50 ¶ 21; D. 58 ¶ 21; see D. 49-4 at 2.  ICE released 181 pages in full, 125 pages in part and
withheld twenty pages in full, citing Exemptions 5, 6, 7(C), and 7(E).  Id.  Furthermore, although
ICE's Office of Diversity and Civil Liberties ("ODCR") "identified potentially responsive
records, ICE learned during this litigation that these records were inadvertently not processed
and produced" to HIRCP.  D. 50 ¶ 19; D. 58 ¶ 19.  "Accordingly, ICE produced these records to
HIRCP on February 2, 2023."  Id.; see D. 49-14.  HIRCP still disputes ICE's invocation of
Exemptions 5 and 7(E).  D. 60 at 23–28.

### B.        The Consolidated ICE FOIA Request

On November 30, 2017, HIRCP submitted three related FOIA requests ("ICE FOIA
Request 1"; ICE FOIA Request 2"; and "ICE FOIA Request 3") (collectively, the "Consolidated
ICE FOIA Request") to ICE seeking three groups of requested records.  D. 62 ¶ 15; D. 64 ¶ 15;
see D. 1-3 at 80–105.

ICE FOIA Request 1 sought "records regarding use of segregation for immigration
detainees within ICE detention facilities and facilities ICE has agreements with or is contracting
with for the purpose of holding immigration detainees" and "[r]ecords and/or data documenting
any changes to the provision of medical and mental health care in segregation . . . ."  D. 62 ¶ 16;
D. 64 ¶ 16; see D. 1-3 at 80–86.  ICE FOIA Request 2 "sought various documents created,
collected, received, or disseminated by ICE personnel regarding solitary confinement, as well as
findings compiled by ICE."  D. 62 ¶ 17; D. 64 ¶ 17; see D. 1-3 at 88–94.  ICE FOIA Request 3
"sought information regarding sexual abuse of LGBT detainees, and solitary confinement related
to special vulnerabilities."  D. 62 ¶ 18; D. 64 ¶ 18; see D. 1-3 at 96–103.  "On February 26, 2018,

ICE consolidated the three FOIA requests into one file and assigned" it a control number.  D. 62

¶ 19; D. 64 ¶ 19.

Each of these requests asked for records pertaining to ICE facilities "in the state of

Massachusetts."  D. 62 ¶¶ 16–18; D. 64 ¶¶ 16–18; <u>see</u> D. 1-3 at 82, 84, 90, 98.  On March 20,

2018 and April 6, 2018, ICE e-mailed HIRCP to clarify "whether the requested records were

limited to the state of Massachusetts, or all ICE facilities."  D. 62 ¶ 20; D. 64 ¶ 20; <u>see</u> D. 1-3 at

112, 114.  On April 1, 2018 and April 8, 2018, HIRCP responded that it was seeking records

"pertaining to all detainees in segregation, for the date range requested, as well as the total

numbers of detainees in ICE facilities in each state," but noted that it "would be willing to accept

the Massachusetts data first."  D. 1-3 at 111, 113; D. 62 ¶ 20; D. 64 ¶ 20.

On April 16, 2019, HIRCP submitted an administrative appeal with ICE regarding the

Consolidated ICE FOIA Request because ICE had not yet responded.  D. 1-3 at 119, 121; D. 50

¶ 25; D. 58 ¶ 25.  On May 11, 2022, ICE responded.  D. 50 ¶ 28; D. 58 ¶ 28; <u>see</u> D. 49-5 at 2.

ICE released 164 pages in full and 345 pages in part, citing Exemptions 5, 6, 7(C), and 7(E).  D.

50 ¶ 26; D. 58 ¶ 26; <u>see</u> D. 49-5 at 2–3.  HIRCP disputes the adequacy of this search and the

application of Exemptions 5 and 7(E).  D. 60 at 10, 23–28.

C.     **The OSC FOIA Request**

"On December 21, 2017, [HIRCP] submitted a FOIA request to the U.S. Office of

Special Counsel (OSC) seeking records created on or after September 2013 related to any

complaints about the use and/or substantive impact of segregation of civil immigration detainees

including 1) any complaints with and/or investigations by the Disclosure Unit; 2) any and all

records and responses related to any complaints and/or investigations; 3) any and all records used

to prepare any responses, memoranda, or reports related to segregation of civil immigration

detainees; 4) any and all records related to the Special Counsel's 'determination as to the completeness and apparent reasonableness' of any and all agency reports on solitary confinement of civil immigration detainees'; and 5) any and all OSC communications transmitted to any other agencies or branches of government." D. 62 ¶ 22; D. 64 ¶ 22; see D. 1-3 at 131.

On May 19, 2020, OSC responded to HIRCP regarding the OSC FOIA Request, releasing 800 pages in full, 241 pages in part and withholding 101 pages in full, citing Exemptions 3, 5, 6, 7(C), and 7(D). D. 50 ¶ 31; D. 58 ¶ 31; see D. 1-3 at 134. "In connection with this May 19, 2020, response, OSC also referred 1,593 pages to DHS for processing." D. 50 ¶ 32; D. 58 ¶ 32; see D. 1-3 at 134. "DHS, in turn, referred these 1,593 pages to CRCL for processing." D. 50 ¶ 32; D. 58 ¶ 32; see D. 49-7 at 2. On July 7, 2022, CRCL responded to HIRCP, releasing 42 pages in full and 159 pages in part, and withholding 349 pages in full, citing Exemptions 5, 6, 7(C), and 7(E). D. 50 ¶ 35; D. 58 ¶ 35; see D. 49-7 at 2. "CRCL also found 283 pages to be duplicates, and 91 pages to be non-responsive." Id. "In connection with this July 7, 2022, response, CRCL also referred 644 pages to ICE, 15 pages to OIG, 8 pages to the DHS Privacy Office (DHS Privacy), and 2 pages to the Department of Justice (DOJ) for processing." D. 50 ¶ 36; D. 58 ¶ 36; see D. 49-7 at 2.

On August 4, 2022, OIG, in response to the fifteen-page referral, released two pages in full and thirteen pages in part, citing Exemptions 6 and 7(C). D. 50 ¶ 37; D. 58 ¶ 37; see D. 49-8. On August 15, 2022, DOJ (through CRCL) responded to HIRCP regarding the two-page referral from CRCL and released these two pages in full. D. 50 ¶ 38; D. 58 ¶ 38; see D. 49-9. On September 14, 2022, ICE responded to HIRCP regarding the 644-page referral from CRCL. D. 62 ¶ 24; D. 64 ¶ 24. "ICE released 56 pages in full, released 399 pages in part, withheld 18 pages in full, and found that 171 pages were duplicative/non-responsive." Id. "On September

21, 2022, ICE re-released a nearly duplicative production of the September 14, 2022 production but the September 21 production contained more redactions and some different documents." Id. On September 22, 2022, DHS Privacy responded to HIRCP regarding the 8-page referral from CRCL and withheld "all 8 pages based on Exemption 5." D. 50 ¶ 40; D. 58 ¶ 40; see D. 49-11 at 2. "On November 21, 2022, DHS Privacy issued a supplemental response letter to [HIRCP] regarding the 8-page referral from CRCL, releasing 4 pages in full that it had previously withheld." D. 50 ¶ 40; D. 58 ¶ 40; D. 49-12 at 2. "DHS Privacy maintained its withholding of the other 4 pages." D. 50 ¶ 40; D. 58 ¶ 40; see D. 49-13 ¶ 5. HIRCP still disputes the application of Exemption 5 as to this production. D. 60 at 23.

## IV.    Procedural History

HIRCP commenced this action on December 13, 2021. D. 1. As summarized above, the Agencies produced some responsive documents after the initiation of this lawsuit. Although there were some attempts to reach mutually agreeable terms about the searches that HIRCP challenges, the parties were not able to reach an agreement. D. 62 ¶¶ 26–27; D. 64 ¶¶ 26–27; see D. 61-9. The Agencies have also produced Vaughn indexes as to the documents they have withheld. D. 49-16 (DHS); D. 49-18 (ICE). The Court heard the parties on the cross motions for summary judgment and took these matters under advisement. D. 71, 72.

## V.    Discussion

### A.    <u>Adequacy of Searches</u>

#### *1.    Legal Standard*

In FOIA cases, an agency must establish that it has "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." <u>Oleskey v. U.S. Dep't of Def.</u>, 658 F. Supp. 2d 288, 294 (D. Mass.

2009) (quoting <u>Oglesby v. U.S. Dep't of Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990)).  "The crucial issue is not whether relevant documents might exist, but whether the agency's search was 'reasonably calculated to discover the requested documents.'"  <u>Maynard v. C.I.A.</u>, 986 F.2d 547, 559 (1st Cir. 1993) (quoting <u>Safecard Servs., Inc. v. S.E.C.</u>, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).  Even if a plaintiff is correct that additional responsive records exist, an agency's failure to locate them "does not *ipso facto* render its search inadequate."  <u>Oleskey</u>, 658 F. Supp. 2d at 298.  A "failure to turn up [a requested] document does not alone render the [agency's] search inadequate; there is no requirement that an agency produce *all* responsive documents."  <u>Nation Magazine, Washington Bureau v. U.S. Customs Serv.</u>, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995) (emphasis in original). The focus of the adequacy inquiry is thus not on the results, but rather on the search itself.  <u>Oleskey</u>, 658 F. Supp. 2d at 298.

To demonstrate that an agency conducted an adequate search, the agency "may rely upon affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith."  <u>Maynard</u>, 986 F.2d at 559.  Such affidavits may include "the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched."  <u>Oglesby</u>, 920 F.2d at 68.  Additional search details may include "the structure of the agency's file system, the scope of the search performed, and the method by which it was conducted."  <u>Sephton v. F.B.I.</u>, 365 F. Supp. 2d 91, 97 (D. Mass. 2005), <u>aff'd</u>, 442 F.3d 27 (1st Cir. 2006)).

Once an agency has produced such a showing, a court must afford the government a presumption of good faith, and "the burden shifts to the requester to 'provide countervailing evidence as to the adequacy of the agency's search.'"  <u>Oleskey</u>, 658 F. Supp. 2d at 294–95 (quoting <u>Iturralde v. Comptroller of Currency</u>, 315 F.3d 311, 313–14 (D.C. Cir. 2003)).  If the

requester introduces evidence that "raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials, summary judgment is inappropriate." Iturralde, 315 F.3d at 314 (citation and internal quotation marks omitted).

2.   *Adequacy of OIG Search*

As a preliminary matter, the parties dispute whether the adequacy of OIG's search is properly before this Court.  D. 65 at 4–5; D. 66 at 9.  On December 10, 2018, OIG released one page in full, withheld twenty-nine pages in part and three pages in full, and referred 221 pages to ICE for processing.  D. 50 ¶ 8; D. 58 ¶ 8.  On April 1, 2019, HIRCP filed an administrative appeal with OIG regarding this request, arguing that "OIG has failed to meet its statutory obligations under FOIA by failing to respond to the request well past the applicable statutory deadlines."  D. 50 ¶ 9; D. 58 ¶ 9.  On April 1, 2020, OIG's Information Law and Disclosure Division denied HIRCP's appeal, explaining, among other things, that OIG had provided a response to HIRCP's FOIA request on December 10, 2018.  Id.  The Agencies argue that HIRCP "waived any challenge to the adequacy of OIG's search" because, following OIG's denial of HIRCP's April 2019 administrative appeal, HIRCP failed to "challenge that denial or ever file an administrative appeal challenging the adequacy of OIG's search."  D. 65 at 4–5 (emphasis removed).  HIRCP argues that it did not further challenge that denial because it was still waiting on the production of the 221 pages referred to ICE.  D. 60 at 14 n.3.  In HIRCP's view, "DHS was no longer managing those documents, and HIRCP had never seen them, so no appeal could be made regarding their sufficiency."  Id.

The Court agrees with HIRCP that it did not waive its challenge to the adequacy of the OIG production.  Contrary to the Agencies' assertions, the complaint does not reasonably suggest that HIRCP conceded the adequacy of the OIG production, especially where, as here, it

is undisputed that not all pages of the production were released to HIRCP until after the complaint was filed.  D. 50 ¶ 14; D. 58 ¶ 14; see D. 1 at 3 (alleging that "DHS has produced only incomplete documentation with regard to the OIG Request"); id. ¶ 118 (seeking an injunction "ordering ICE to process the 221 pages responsive to the OIG Request").

Given that the burden remains with OIG to "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents," Am. C.L. Union of Massachusetts v. Immigr. & Customs Enf't, No. 21-CV-10761-AK, 2022 WL 1912882, at *4 (D. Mass. June 3, 2022) (citation and internal quotation marks omitted), and OIG has not submitted an affidavit describing the search terms and methods it used during its search, see D. 60 at 14 n. 3; D. 66 at 9, 1, the Court grants HIRCP's motion for summary judgment as to the adequacy of OIG's search and denies the Agencies' motion as to same.  The Court orders counsel for the parties to meet and confer to agree on search terms and locations to be searched by OIG and a proposed time frame for such search.  Such joint proposal should be filed by September 1, 2023.

### 3.     Adequacy of ICE Search

ICE relies upon the affidavit of Fernando Pineiro, D. 49-17, FOIA Director of the ICE FOIA Office and the "ICE official immediately responsible for supervising ICE responses to requests for records under" FOIA.  Id. ¶ 1.  Pineiro states that "ICE employees maintain records in several ways," including "electronic records on their individual computer hard drives, their program office's shared drive" and "DVDs, CDs, and/or USB storage devices."  Id. ¶ 25. Additionally, Pineiro states that "ICE employees use various methods to store their Microsoft Outlook e-mail files."  Id. ¶ 26.  According to Pineiro, the ICE FOIA Office determined that OPR, ERO, the Office of Acquisition Management ("OAQ") and ODCR "were the program offices likely to have responsive records" based on the subject matter of HIRCP requests.  Id. ¶

30. In all, Pineiro's affidavit describes seven distinct searches performed at the direction of ICE. Id. ¶¶ 33–49.

### a)    The PREA Search

A Management and Program Analyst within ICE's Office of Professional Responsibility ("OPR") tasked the Office of Detention Oversight ("ODO") and Prison Rape Elimination Act ("PREA") to conduct a search, without a date range cutoff, using the terms "detainees," "segregated" and "housing."  Id. ¶ 34.  "The PREA Office stated that they had no responsive records." Id.

### b)    The ODO Search

ODO's Unit Chief "conducted a search of the ICE FOIA Library" using the terms "ODO Report" and "ODO Final Report" without a date range cutoff, which also produced no responsive records. Id. ¶¶ 35–36.

### c)    The First ERO Search

A Management and Program Analyst within ERO searched an "Audit" folder on Microsoft Outlook entitled "OIG-17-119 Segregation of Detainees with Mental Health Needs." Id. ¶ 40.  Additionally, the Detention and Deportation Office "searched the ERO Policy Library," without a date range cutoff, using the search terms "Detainee segregation," "Transgender," and "LGBTI." Id. Potentially responsive records were found and forwarded to the ICE FOIA Office for review and processing. Id.

### d)    The Second ERO Search

"A Unit Chief with the ERO Field Operations Domestic Operations Division . . . searched their archived emails, by using the find/search function in their outlook accounts as well as the office's shared drive computer system using terms including 'LGBTI detainees,'

'segregated housing,' 'suicidal detainee,' 'segregation,' 'special housing,' and 'protective custody' and "determined that the information requested would be with the Custody Management Division." Id. ¶ 42.

e)      The Third ERO Search

The Segregation Coordinator within the ERO's Custody Management Division searched the SRMS using the terms "BOS AOR" and "MA" with no date range cutoff.   Id. ¶ 43. "Potentially responsive records were found and forwarded to the ICE FOIA Office for review and processing." Id.

f)      The Fourth ERO Search

A Regional Field Medical Coordinator within ERO's ICE Health Services Corps ("IHSC") Division "conducted a search of her emails, by using the find/search function in her outlook accounts, including sent, deleted, incoming, outgoing and archived folders, as well as the office's shared drive computer system" using the terms "mental health" and "segregation" with no date range cutoff.  Id. ¶ 44.

g)      ODCR's Search

An Equal Employment Opportunity Specialist at ODCR "searched the ICE Civil Liberties and ODCR Sharepoint system" using the terms "segregation," "mental health" and "segregation and mental health."  Id. ¶ 49.  "She also searched individual folders on her desktop and hard drive" and "individual folders in her outlook account and archived emails, by using the find/search function, as well as the office's shared drive computer system" using the same search terms with no date range cutoff.  Id.  This search produced thirty-one pages of potentially responsive records, twenty-four of which were sent to HIRCP.  Id. ¶ 50.

Pineiro's affidavit describes the manner in which ICE employees generally maintain records, specifies the ICE offices that were deemed the most likely to possess responsive records, the folders and email accounts that were searched and the search terms that were used. Accordingly, the Court concludes that the Pineiro affidavit provides sufficient, nonconclusory detail about the searches, which were reasonably calculated to locate responsive documents, and therefore applies a presumption of good faith to ICE's search.  See Oleskey, 658 F. Supp. 2d at 294–95.

The Court is persuaded, however, that HIRCP has introduced sufficient evidence to rebut this presumption of good faith.  Iturralde, 315 F.3d at 314.  Specifically, HIRCP argues, and the Court agrees, that ICE's search was "inadequate for three reasons:  it did not uncover specifically identifiable responsive documents; it employed unreasonably narrow terms; and it explored unreasonably cabined locations."  D. 60 at 10.

h)      Specifically Identifiable Responsive Documents

HIRCP first argues that ICE's search was inadequate because it failed to produce documents that "indisputably exist and were specifically requested by HIRCP."  D. 60 at 11. The demonstrated existence of several unproduced but responsive documents does not require, but can give rise to an inference that an agency's search was inadequate.  See Founding Church of Scientology of Washington, D. C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979) (concluding that NSA had "not yet eliminated an unavoidable inference that its [search] technique may have left something to be desired" where discovery in a separate FOIA proceeding against CIA revealed that NSA was in possession of sixteen unproduced but responsive documents).

Here, it is undisputed that ERO field offices and ICE headquarters use the SRMS to document, track, and facilitate review of all segregation cases and that ERO's FODs must use SRMS to report segregation placement data that falls under the ICE directive's reporting requirements.  D. 62 ¶ 7; D. 64 ¶ 7.  Although the record suggests that ICE produced these reports weekly, see D. 61-10 at 2, HIRCP maintains that ICE has produced none of these reports in direct response to the Consolidated ICE FOIA Requests and only "a small number" of these reports in total.  D. 60 at 11.  Moreover, the record also suggests that ICE failed to produce specifically identifiable records related to OIG's site visits.  The OIG FOIA request sought all records related to "[p]rior ICE inspection reports on detention facilities used by ICE" during the pertinent time period.  D. 1-3 at 4.  It is undisputed that during the pertinent time period, OIG selected seven facilities "to visit and review judgmental samples of instances in which detainees with mental health conditions were held in segregation and to assess the confinement conditions."  D. 62 ¶ 8; D. 64 ¶ 8; D. 61-2 at 18.  ICE produced only one site visit report, D. 1-3 at 45–64, even though the record suggests that OIG generated such reports for the other six sites it visited as part of its review.

Accordingly, the Court is persuaded that ICE's failure to produce SRMS reports for the pertinent period or to produce six of the seven OIG site visits reports "raises substantial doubt" that ICE's search was adequate.  Iturralde, 315 F.3d at 314 (citation and internal quotation marks omitted).

i)      Search Terms

HIRCP also argues that ICE's search was inadequate because it "used unreasonably narrow search terms."  D. 60 at 13.  "ICE need not establish that its chosen search terms were perfectly tailored to produce each and every document potentially responsive" to HIRCP's

request.  Am. C.L. Union of Massachusetts, 2022 WL 1912882, at *5.  "A failure to use certain search terms, including those emphasized by [a plaintiff], is not automatically unreasonable, so long as the agency provided an explanation as to why the search term was not used."  Knight First Amend. Inst. at Columbia Univ. v. Centers for Disease Control & Prevention, 560 F. Supp. 3d 810, 823 (S.D.N.Y. 2021) (citation and internal quotation marks omitted); see Brennan Ctr. for Just. at New York Univ. Sch. of L. v. U.S. Dep't of Just., 377 F. Supp. 3d 428, 434 (S.D.N.Y. 2019) (citation omitted) (explaining that "an agency's choice of search terms is not conclusive" and "[w]here challenged, agencies have to explain why certain search terms, clearly relevant, were not used").

Upon learning the specific terms that ICE used in its searches, HIRCP proposed that ICE use additional search terms, including "segregate*" to capture variations of the term "segregation," as well as "solitary" or "SRMS" or "protective custody" or "isolation" or "mental illness" among other terms.  D. 61-9.  The Court is persuaded that at least some of these proposed synonyms and variations are likely to be used in responsive documents and that ICE has not reasonably justified why it did not use them.  As HIRCP argues, the Pineiro affidavit does not explain why the PREA search did not include common variations of the term "detainees" and "segregated" such as "detainee" and "segregate*" or synonyms such as "ad seg"[1] or "solitary" or "protective custody" or "isolation."  D. 60 at 15.  The affidavit does not explain why "ODO Report" and "ODO Final Report" were sufficient to uncover responsive documents through the ODO search.  Id.  The affidavit similarly does not explain, as to the second and third ERO searches, why "detainee segregation" and "LGBTI detainees" were searched as opposed to "segregation" or "LGBTI" as stand-alone terms along with their common

---

[1] HIRCP claims, and the Agencies do not dispute, that "ad seg" is a common abbreviation for "administrative segregation."  See D. 60 at 15 n.4.

variations and synonyms.  Id.  The affidavit does not explain why limiting the third ERO search

of the SRMS using the geographic terms "BOS AOR" and "MA" would reasonably uncover all

responsive records.  D. 60 at 15.  Finally, as to the fourth ERO search and the ODCR search, the

affidavit does not reasonably justify why variations and synonyms for the terms "segregation"

and "mental health" were not used.  Id.

Accordingly, the Court also concludes that ICE's failure to reasonably justify its search

methodology "raises substantial doubt" that ICE's search was adequate.  Iturralde, 315 F.3d at

314 (citations and internal quotation marks omitted).

j)    Locations

Finally, HIRCP argues that "ICE searched an excessively narrow set of locations,

rendering the searches inadequate."  D. 60 at 16.  The Court agrees.  "[A] request for an agency

to search a particular record system—without more—does not invariably constitute a lead that an

agency must pursue.  Instead, [a] lead must be both clear and certain and so apparent that the

[agency] cannot in good faith fail to pursue it.  Additionally, [a]lthough an agency may not

ignore a request to search specific record systems when a request reaches the agency before it

has completed its search, . . . a search is generally adequate where the agency has sufficiently

explained its search process and why the specified record systems are not reasonably likely to

contain responsive records."  Stalcup v. Dep't of Def., No. 13-cv-11967-LTS, 2022 WL

1714250, at *3 (D. Mass. Mar. 23, 2022) (alterations in original) (internal quotation marks

omitted) (quoting Mobley v. CIA, 806 F.3d 568, 582 (D.C. Cir. 2015)).

The record shows that through the Consolidated ICE FOIA Request, HIRCP specifically

requested records from Detention Service Managers ("DSMs"), ERO LGBTI Field Liaisons, the

EID Arrest Graphical User Interface for Law Enforcement ("EAGLE"), ENFORCE Alien

Module ("EARM") and Risk Classification Assessment ("RCA") data sources, the Segregation

Review Coordinator and the Detention Monitoring Council.  D. 1-3 at 82, 101–02.  HIRCP

asserts that it was unreasonable for ICE not to search these specific locations and instead only

search the SRMS system using the terms "BOS AOR" and "MA," IHSC's drives, the ERO Field

Operation's Unit Chief computer files and the Boston's Assistant Field Office Director's email.

D. 60 at 17; see D. 49-17 ¶¶ 40–45.  The Agencies, relying on the good faith presumption, argue

that HIRCP's assertions are insufficient "to cast substantial doubt on the agency's assertions."

D. 65 at 10–11.  The Court is persuaded, however, that the specific locations referenced by

HIRCP as to the Consolidated ICE FOIA Request should have been searched if, as HIRCP

asserts and the Agencies do not dispute, these entities "are most directly responsible for

overseeing the management of segregation and detention of vulnerable populations."  D. 60 at

18.  ICE's failure to search the data sources directly managed by these entities, again, "raises

substantial doubt" that its search was adequate.  Iturralde, 315 F.3d at 314 (citations and internal

quotation marks omitted).

On the other hand, the Court is not persuaded that HIRCP has rebutted the good faith

presumption as to the locations searched as to the CRCL portion of the OIG and CRCL FOIA

Request.  HIRCP asserts that it "inquired about a specific, contained set of documents:  the

subset of public complaints against ICE that ICE had previously provided to CRCL about mental

health, and CRCL's responses to those investigative records."  D. 60 at 18.  HIRCP posits that "a

reasonable search structure would have involved identifying the digital or physical files where

such complaints are stored, then performing a search within those records" and that

"[u]ncovering responsive documents should have been quite straightforward, as ICE presumably

continues to regularly produce the documents for the DHS Inspector General."  Id. at 19.  Unlike

its claims as to the Consolidated ICE FOIA Request, however, these claims about the discoverability of such complaints are largely speculative.  HIRCP has not identified with sufficient specificity how the design of ICE's search was not reasonably calculated to produce these documents.  Rather, HIRCP merely speculates that ICE's search as to these documents should have been "straightforward," id., which is insufficient to rebut the good faith presumption.  See Maynard, 986 F.2d at 560 (noting that the presumption of good faith cannot be rebutted by "purely speculative claims about the existence and discoverability of other documents" (citation and internal quotation marks omitted)).

Accordingly, the Agencies' motion for summary judgment on the issue of the adequacy of the searches is allowed in part only as to the locations searched as to the CRCL portion of the OIG and CRCL FOIA Request and otherwise is denied.  HIRCP's motion for summary judgment is correspondingly denied as to the locations searched as to the CRLCL portion of the OIG and CRCL FOIA Request, but is otherwise allowed.  The Court orders counsel for the parties to meet and confer to agree on search terms for all searches involving ICE and locations to be searched (locations only as to non-CRCL portion of the OIG and CRCL FOIA Request) and a proposed time frame for such search to be completed.  Such proposal should be filed by September 1, 2023.

### B.    FOIA Exemptions

"'FOIA provides that certain categories of materials are exempted from the general requirements of disclosure,' but these exemptions 'are to be construed narrowly, with any doubts resolved in favor of disclosure.'"  Am. C.L. Union of Massachusetts, Inc., 448 F. Supp. 3d at 36 (quoting Carpenter v. U.S. Dep't of Just., 470 F.3d 434, 438 (1st Cir. 2006) and Moffat v. U.S. Dep't of Just., 716 F.3d 244, 250 (1st Cir. 2013)).  "The government bears the burden of proving

that withheld materials fall within one of the statutory exemptions." Id. (quoting Carpenter, 470 F.3d at 438).

Here, the Agencies cited FOIA Exemptions 5, 6, 7(C), and 7(E) and have moved for summary judgment. HIRCP appears only to challenge the Agencies' invocation of Exemptions 5 and 7(E). See D. 60 at 23–28; D. 66 at 16–18, so the Court denies the Agencies' motion for summary judgment as moot as to Exemptions 6 and 7(C). Accordingly, the Court turns only to whether the Agencies properly applied Exemptions 5 and 7(E). To support these exemptions, the Agencies rely upon affidavits and Vaughn indexes by ICE and DHS submitted to the Court in connection with their motion for summary judgment. D. 49-13; D. 49-15; D. 49-16; D. 49-18.

     *1.*    *Exemption 5*

FOIA's Exemption 5 aims to "facilitate[ ] government decision making by:  (1) assuring subordinates will feel free to provide uninhibited opinions, (2) protecting against premature disclosure of proposed government policies, and (3) preventing confusion among the public that may result from releasing various rationales for agency action." New Hampshire Right to Life v. U.S. Dep't of Health & Hum. Servs., 778 F.3d 43, 52 (1st Cir. 2015). The exemption thus protects from disclosure "inter-agency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency," and "incorporates doctrines that would limit the scope of discovery, including the attorney-client privilege, the work-product protection, and the deliberative-process privilege." Stalcup v. C.I.A., No. 11-cv-11250-FDS, 2013 WL 4784249, at *4 (D. Mass. Sept. 5, 2013), aff'd, 768 F.3d 65 (1st Cir. 2014) (alteration in original) (quotations and citation omitted). Although the Agencies invoke Exemption 5 on these three bases, HIRCP only challenges their invocation of the deliberative process privilege. D. 60 at 23.

To invoke the deliberative process privilege, an agency "must demonstrate that the communications were both 'predecisional' and 'deliberative.'"  New Hampshire Right to Life, 778 F.3d at 52 (quoting Providence J. Co. v. U.S. Dep't of Army, 981 F.2d 552, 557 (1st Cir. 1992)).  "A document is predecisional if the agency can:  '(1) pinpoint the specific agency decision to which the document correlates, (2) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision [and was not the final decisionmaker], and (3) verify that the document precedes, in temporal sequence, the decision to which it relates.'"  Id. (quoting Providence J. Co., 981 F.2d at 557).  Conclusory assertions that merely parrot the legal test do not suffice and an agency's description of documents must at least specify the relevant final decision.  See Senate of the Com. of Puerto Rico v. U.S. Dep't of Just., 823 F.2d 574, 585 (D.C. Cir. 1987); Sensor Sys. Support, Inc. v. F.A.A., 851 F. Supp. 2d 321, 331 (D.N.H. 2012) (concluding that agency cannot invoke deliberative process privilege without "at the very least identify[ing] the decision contemplated").  "A predecisional document will qualify as 'deliberative' provided it (i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.'"  Providence J. Co., 981 F.2d at 559 (citations and internal quotation marks omitted).  "[T]he agency must present to the court the function and significance of the document(s) in the agency's decisionmaking process, the nature of the decisionmaking authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents."  Arthur Andersen & Co. v. I. R. S., 679 F.2d 254, 258 (D.C. Cir. 1982) (internal citations and quotation marks omitted).

a)    <u>DHS and ICE Have Not Shown that Certain Redacted Emails and Internal Memoranda are Predecisional</u>

As an initial matter, several entries in DHS's Vaughn index and one entry in ICE's Vaughn index invoking Exemption 5 fail to specify the final agency decision being contemplated.  <u>See</u> D. 49-16 at 2 (describing "recommendations from CRCL to ICE" but not specifying policy or decision), 6, 12, 14, 15, 18 (describing several emails involving an "internal communication about the scope of the investigation and processing for conducting the investigation" but not specifying the nature of the investigation or the agency decision being contemplated), 9 (describing "internal communication about ICE's Disciplinary Monitoring Council" but not specifying agency decision being contemplated), 10 (describing "internal communication related to ICE" but not specifying policy or decision), 16 (describing "internal communication related to CRCL's impressions regarding the creation of subcommittee to focus on the segregation of detainees with mental health concerns" but not specifying final agency decision being contemplated), 11–17, 21–22, 30–32, 45, 47–48 (describing several emails involving "internal communication related to review of export report and CRCL's impressions regarding the process for the segregation of detainees" or "the process for charging detainees" but not specifying final agency decision being contemplated), 45 (describing the draft version and final versions of the "CRCL Agenda for the ICE DMC Subcommittee Meeting" and an email that "includes internal reporting of detainees with sensitive information about their identities and locations" but not specifying final agency decision being contemplated), 46 (describing "an internal discussion about the segregation of a detainee" but not specifying agency decision being contemplated); D. 49-18 at 19 (describing email communications that "relate to discussions on how data relating to FY 16 Mental Health was analyzed" but not specifying agency decision being contemplated); <u>see also</u> <u>Sensor Sys. Support, Inc.</u>, 851 F. Supp.

2d at 331 (noting that agency must identify the decision being deliberated); <u>Bloche v. Dep't of Def.</u>, 370 F. Supp. 3d 40, 54 (D.D.C. 2019) (concluding that index descriptions were insufficient because specific policies were "never identified or described").

Where, as here, a court concludes that a Vaughn index or agency affidavit inadequately describes records redacted or withheld under the deliberative process privilege, it may deny summary judgment as to those records and may "direct the government to revise its submissions with respect to [the] specific records."  <u>Church of Scientology Int'l.</u>, 30 F.3d at 239; <u>see</u> <u>Seife v. U.S. Dep't of State</u>, 298 F. Supp. 3d 592, 630–31 (S.D.N.Y. 2018) (denying summary judgment without prejudice as to documents withheld under Exemption 5 and requiring agency to submit updated Vaughn index); <u>Elec. Frontier Found.</u>, 826 F. Supp. 2d at 175 (denying summary judgment without prejudice as to the documents insufficiently described in the index and "directing the agency to revise their Vaughn submissions, taking into account the deficiencies identified by the Court"); <u>Judicial Watch, Inc. v. U.S. Postal Serv.</u>, 297 F. Supp. 2d 252, 270 (D.D.C. 2004) (denying summary judgment and requiring agency to review all previously withheld and redacted documents, and after review, produce documents unredacted that it determines do not fall under Exemption 5 and submit more detailed Vaughn index for those that it still believes should be withheld).

Accordingly, because the Court concludes that the Vaughn index descriptions are inadequate as to the records discussed above, DHS shall either submit a revised Vaughn index by September 1, 2023, correcting the deficiencies outlined above as to those documents withheld or redacted solely on the basis of Exemption 5, or produce those documents to HIRCP and inform the Court of its decision, also by September 1, 2023.

b)    DHS Has Not Shown that Factual Materials in Expert Reports Are
Inextricably Intertwined with Policy Making Recommendations

DHS invoked the deliberative process privilege to withhold in full a group of expert reports prepared by CRCL-retained consultants who investigated civil rights complaints at ICE detention facilities.   See D. 49-16 at 19–29, 32–45.   HIRCP specifically challenges the withholding of the underlying factual material in the reports, arguing that those facts are "post-decisional because they describe actions that ICE has already taken in its detention centers."   D. 60 at 26.   The Agencies argue that the reports, including their findings of fact, were properly withheld because they "reflect deliberations and recommendations about future decisions regarding whether and how to address those complaints."   D. 65 at 15.

In the FOIA context, "solely factual matters severable from deliberative portions of documents should be disclosed."   Reilly v. U.S. E.P.A., 429 F. Supp. 2d 335, 342 (D. Mass. 2006) (citing Env't Prot. Agency v. Mink, 410 U.S. 73, 89 (1973)).   On the other hand, "[f]actual materials [which] are inextricably intertwined with policy making recommendations so that their disclosure would compromise the confidentiality of deliberative information" are entitled to protection under Exemption 5.   Id. at 351 (second alteration in original and internal quotation marks omitted) (quoting Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin., 610 F.2d 70, 85 (2d Cir. 1979)).

In an affidavit supporting DHS's Vaughn index, Rosemary Law, the FOIA Officer in the Office for CRCL, stated that the reports "contain unverified observations of first impression, expert analyses of facts and information gathered during the course of the expert's investigation of the facility, and the uninhibited opinions and recommendations of CRCL's expert consultant intended for evaluation and review by CRCL."   D. 49-15 ¶ 18.   These justifications are reflected

in DHS's Vaughn index, in which a similar rationale is repeated throughout. <u>See generally</u> D. 49-16.

In a separate FOIA proceeding, a district court rejected a similar justification proffered by DHS for withholding the factual findings in expert reports. <u>See</u> <u>Project on Gov't Oversight, Inc. v. U.S. Dep't of Homeland Sec.</u>, No. 18-cv-2051-RCL, 2023 WL 2139380, at *8 (D.D.C. Feb. 21, 2023). There, the court noted that, unlike "'culling or organization of an *existing* set of facts into a summary, not the initial *finding* of those facts,'" unverified observations of first impression as a "category of deliberative information 'finds no support in extant FOIA jurisprudence.'" <u>Id.</u> (emphasis in original) (quoting <u>Nat'l Pub. Radio, Inc. v. U.S. Dep't of Homeland Sec.</u>, No. 20-cv-2468-RCL, 2022 WL 4534730, at *6 (D.D.C. Sept. 28, 2022)). Accordingly, the court concluded that "unverified observations of first impression are not deliberative in nature" and that "the deliberative process privilege applies only to the withholdings in this case that represent the experts' analysis, opinions, or recommendations." <u>Id.</u> The Court finds this reasoning persuasive and applicable here.

The Court is further persuaded by the approach of courts that have drawn a distinction between factual material analogous to a "complex decision in an adjudicatory proceeding," which properly can be withheld under Exemption 5, or analogous to "an investigative report prepared only to inform," which cannot. <u>Adelante Alabama Worker Ctr. v. United States Dep't of Homeland Sec.</u>, 376 F. Supp. 3d 345, 363 (S.D.N.Y. 2019) (quoting <u>Mapother v. Dep't of Justice</u>, 3 F.3d 1533, 1539 (D.C. Cir. 1993)). This distinction is relevant here. The expert reports, in general, evaluate the medical care available to detainees at certain facilities. <u>See</u> D. 49-16 at 19–29, 32–45. "That structure is more in keeping with an 'investigative report' into a specific question, than it is a 'complex decision in an adjudicatory proceeding.'" <u>Adelante</u>, 376

F. Supp. at 363.  The Court cannot conclude, therefore, that any withholdings of purely factual material in the expert reports were proper.

The Court is also concerned that DHS has improperly withheld purely factual and severable material in each of the documents it has withheld in full under Exemption 5.  D. 49-16 at 19–48.  For example, DHS withheld in full an internal memorandum that involves "internal communication related to the review of ICE's segregation report and CRCL's impressions regarding the process for the segregation of detainees."  Id. at 21.  Other than the conclusory statement that "[t]he redacted information contains agency's deliberations about CRCL's review process," id. at 22, DHS does not provide a sufficient explanation for why it could not segregate and release the underlying factual material contained in this memo.

Accordingly, the Court denies the Agencies' motion for summary judgment as to Exemption 5 and correspondingly allows HIRCP's motion for summary judgment.  The Court orders DHS to produce the documents it has withheld or redacted solely under Exemption 5 or review each document it has withheld under Exemption 5, including all expert reports, and to release the severable factual material contained therein consistent with this opinion, including, but not limited to, all "unverified observations of first impression" by September 1, 2023.

### 2.    Exemption 7(E)

HIRCP also challenges the Agencies' invocation of Exemption 7(E).  D. 60 at 27–28. "Under this exemption, an agency may withhold law enforcement records that disclose either: (1) techniques and procedures for law enforcement investigations or prosecutions or (2) guidelines for law enforcement investigations or prosecutions that could reasonably be expected to risk circumvention of the law."  Am. C.L. Union Found. of Massachusetts v. Fed. Bureau of Investigation, No. 14-cv-11759, 2016 WL 4411492, at *4 (D. Mass. Aug. 17, 2016) (citations

omitted).  "In this context, the phrase 'techniques and procedures' has been defined as 'how law enforcement officials go about investigating a crime' while 'guidelines' has been defined as 'an indication or outline of future policy or conduct.'"  Id. (quoting Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec., 626 F.3d 678, 682 (2d Cir. 2010)).  To withhold documents pursuant to Exemption 7(E), "the [agency] need only 'establish a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law.'"  Blackwell v. FBI, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting Campbell v. Dep't of Justice, 164 F.3d 20, 32 (D.C. Cir. 1998)) (second citation omitted).

ICE invoked Exemption 7(E) to withhold:  (1) "a user guide on how to use the IHSC electronic medical record system to report on detainees with mental health diagnoses who are placed into segregation," (2) several reports detailing instances of sexual abuse and assault in ICE detention, (3) emails, reports and correspondence regarding a mentally ill detainee and his disciplinary appeal and (4) "internal emails between the American-Arab Anti-Discrimination Committee and ICE employees pertaining to an issue with an inmate's religious accommodation; an Inmate/Resident Grievance Form; and an Informal Resolution Form."  D. 49-18 at 11, 29–35, 47, 53.

As to the medical record system user guide, ICE's Vaughn index explains that it was withheld under Exemption 7(E) because "[d]isclosure of the methods that ICE uses to assess detainees and come to a decision on segregation and mental health status could enable an individual to navigate, alter, and/or manipulate the database in their favor."  Id. at 11.  The Court is persuaded that there is a rational nexus between disclosure of nonpublic information related to the database ICE uses to assess whether to segregate detainees and a possible security risk were

an individual to gain unauthorized access to that system.  See Levinthal v. Fed. Election Comm'n, 219 F. Supp. 3d 1, 8 (D.D.C. 2016) (noting that courts "repeatedly have held that information connected to law enforcement databases qualifies for exemption under 7(E)").

The Court is also persuaded that the reports relating to sexual abuse and assault were properly redacted under Exemption 7(E).  ICE's Vaughn index indicates that these reports were redacted because "disclosure of how ICE classifies abuse allegations is not publicly available information and release of this information could permit people seeking to interfere with law enforcement investigations and/or operations to take proactive steps to counter operational and investigative actions taken by ICE during enforcement operations."  D. 49-18 at 31–32, 35. There is a rational nexus between disclosure of ICE's system of classifying abuse allegations and an increased risk of interference with ICE's ability to investigate these abuse allegations. Accordingly, these reports were properly redacted under Exemption 7(E).

Finally, the Court concludes that the redaction of the case numbers in the documents pertaining to a mentally ill detainee and his disciplinary appeal and a detainee's religious accommodation was proper under Exemption 7(E).  Id. at 52, 55.  According to ICE's Vaughn index, both sets of documents had case numbers redacted because their release "could reveal techniques and/or procedures for law enforcement investigations or prosecutions which could reasonably be expected to risk circumvention of the law."  Id.  The Court is persuaded that there is a rational nexus between the disclosure of such case numbers and an increased security risk. See Am. C.L. Union of Maine Found. v. U.S. Dep't of Homeland Sec., 470 F. Supp. 3d 40, 57 (D. Me. 2020) (concluding that "specific internal incident numbers" and "event codes" that "could assist unauthorized users who gain improper access to law enforcement databases in deciphering the meaning of the internal incident numbers and codes" were properly redacted

under Exemption 7(E)); see also Parker v. U.S. Immigration & Customs Enforcement, 238 F. Supp. 3d 89, 100–01 (D.D.C. 2017) (concluding that ICE properly withheld case numbers, among other sensitive information, under Exemption 7(E)).

Accordingly, the Court allows the Agencies' motion for summary judgment as to Exemption 7(E) and correspondingly denies HIRCP's motion for summary judgment.

## VI.    Conclusion

For the foregoing reasons, as to the adequacy of searches, the Court ALLOWS the Agencies' motion for summary judgment only as to the locations searched as to the CRCL portion of the OIG and CRCL FOIA Request and otherwise DENIES the motion.  The Court correspondingly DENIES HIRCP's motion for summary judgment only as to the locations searched as to the CRCL portion of the OIG and CRCL FOIA Request and otherwise ALLOWS HIRCP's motion for summary judgment as to the adequacy of OIG's and ICE's searches.  As to the exemptions, the Court DENIES the Agencies' motion as to Exemptions 6 and 7(C) as moot, but ALLOWS it as to Exemption 7(E) and DENIES it as to Exemption 5.  The Court ALLOWS HIRCP's motion as to Exemption 5 and DENIES it as to Exemption 7€.  The Court ORDERS counsel for the parties to meet and confer to agree on search terms and locations (except as to the locations searched as to the CRCL portion of the OIG and CRCL FOIA request) to be searched as to both OIG's search and ICE's search with a proposed time frame for completion of this search.  Such joint proposal should be filed by September 1, 2023.  The Court also ORDERS DHS to review the document withheld or redacted solely on the basis of Exemption 5, including all expert reports, and either submit a revised Vaughn index by September 1, 2023, correcting the deficiencies outlined above, or produce the documents unredacted to HIRCP and inform the Court of its decision, also by September 1, 2023.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge